**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KATHERYN M. SCHMIDT, | CASE NO. 1:13-cv-3074-SHR-GBC |
| Plaintiff, | (JUDGE RAMBO) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 8, 9, 17, 18, 24 |

## REPORT AND RECOMMENDATION

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Katheryn M. Schmidt for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). In order to receive DIB, Plaintiff has to establish disability prior to June 30, 2010, her date last insured. A state agency physician reviewed Plaintiff's records, and concluded that she could engage in light work as of June 30, 2010. The administrative law judge ("ALJ") relied on this opinion and concluded that Plaintiff was not disabled as of June 30, 2010. Plaintiff asserts that the Court should reweigh the medical evidence that was reviewed by the state agency physician and find that it supports an award of benefits.  However, the ALJ was entitled to rely on the state agency physician's

interpretation of these records. Plaintiff also asserts that the ALJ should have included an additional limitation related to her ability to finish tasks, but there was no medical evidence of a limitation in finishing tasks, and the ALJ properly found that Plaintiff's claims were not credible. Plaintiff finally argues that a medical opinion rendered after the ALJ decision provides grounds for a remand, but she provided no good cause for failing to present this opinion to the ALJ. For the foregoing reasons, the Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

## II.    Procedural Background

On March 22, 2011, Plaintiff filed an application for DIB. (Tr. 168-75). On June 7, 2011, the Bureau of Disability Determination denied this application (Tr. 134-46), and Plaintiff filed a request for a hearing on September 16, 2011.  (Tr. 147). On June 12, 2012, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert appeared and testified. (Tr. 110-33).  On July 24, 2012 the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 57-75). On September 6, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 55), which the Appeals Council denied on October 21, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On December 20, 2013, Plaintiff filed the above-captioned action pursuant

to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On March 14, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 8, 9). On April 28, 2014, the case was referred to the undersigned Magistrate Judge. On June 16, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 17). On July 15, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 18). On November 13, 2014, Plaintiff filed a brief in reply. (Doc. 24). The matter is now ripe for review.

### III.       Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.   Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520.   The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart

P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

Plaintiff was born on July 26, 1961, and was classified by the regulations as a younger individual through the date last insured. (Tr. 70). 20 C.F.R. § 404.1563. Plaintiff has at least a high school education and has past relevant work as a hostess and a receptionist/typist. (Tr. 70). Plaintiff must establish disability prior to June 30, 2010, her date last insured, to be entitled to DIB. (Tr. 134).

On March 20, 2009, an MRI of Plaintiff's cervical spine revealed "mild abnormalities." (Tr. 563).

On April 23, 2009, Plaintiff was evaluated by Dr. Shahzad Khan, M.D. at Neurology and Sleep Consultants, LLD at the request of her primary care physician for evaluation of an abnormal MRI for chronic headache. (Tr. 245). She reported that her headaches began when she was sixteen or seventeen years old and that they were "usually sharp, dull and throbbing." (Tr. 245). She reported that they last for one to two days and occur three to four times a month. (Tr. 245). Plaintiff reported some relief with over-the-counter pain medications but no relief from "medicine like Imitrex and Midrin." (Tr. 245). She reported a history of "fever, fatigue, night sweats, vision loss, sore throat, anxiety, nausea, headache, neck pain for one year and can radiate to right arm [more than the] left, numbness of hands, right [greater than] left for one year or so, muscle spasm and insomnia." (Tr. 245). On exam, she was alert, attentive, and oriented. (Tr. 246). She "recall[ed] 3 of 3 objects at 1-2 minutes." (Tr. 246). She had "good spontaneous speech and comprehension" and her "attention span [was] normal." (Tr. 246). Her mood "seemed appropriate" and she had an "adequate fund of knowledge." (Tr. 246). Examination of her cranial nerves was normal. (Tr. 246). Her motor examination was normal, with normal muscle tone, muscle mass, muscle strength, and reflexes. (Tr. 246). Her sensation was "normal" and her gait and station were "normal." (Tr.

246). She was assessed to have non-specific white matter abnormalities based on her abnormal MRI, headache, skin sensation disturbance, and cervical spondylosis. (Tr. 246). She was prescribed Fioricet and Gababentin, advised to avoid use of tobacco, and instructed to do regular physical activity. (Tr. 246).

On May 27, 2009, Plaintiff followed-up with Dr. Khan. (Tr. 250). She was a "conscious, cooperative, oriented patient in no acute distress." (Tr. 250). She had "good spontaneous speech." (Tr. 250). Her motor examination was normal, her sensation was intact, and her gait and station were normal. (Tr. 250). Plaintiff had not started physical therapy and had just obtained her prescriptions that day. (Tr. 250). She was going to "start physical therapy." (Tr. 251). Her medications were continued. (Tr. 251).

On June 5, 2009, Plaintiff slipped and fell at work and fractured her left knee. (Tr. 318).

On July 13, 2009, Plaintiff followed-up with Dr. Khan. (Tr. 252). He noted that she had "cancelled her previous appointments…has not started physical therapy as advised previously." (Tr. 252). Plaintiff reported benefit from Flexeril for only a few days. (Tr. 252). On exam, she was a "conscious, cooperative, oriented patient in no acute distress." (Tr. 252). She had "good spontaneous speech." (Tr. 252). Her motor examination was normal, her sensation was intact, and her gait and station were normal. (Tr. 252-53). She indicated that she would try

to see Dr. Maxime Gedeon, M.D. that day to see if she could receive an epidural steroid injection. (Tr. 253). He increased her Gababentin and continued her Flexeril. (Tr. 253).

On July 21, 2009, Plaintiff was evaluated by Dr. Gedeon. (Tr. 316). She reported a history of chronic neck pain that radiates into her right arm that is associated with headaches. (Tr. 316). She reported that Dr. Kahn had performed an EMG that showed she did not have carpal tunnel syndrome or multiple sclerosis. (Tr. 316). She reported "poor quality of life due to pain in her neck and low back pain" and "state[d] that with prolonged sitting, she experiences burning sensation on the right side of her neck." (Tr. 316). On exam, she had decreased range of motion and tenderness in her cervical spine, her motor and sensory examination was "unremarkable," she had decreased range of motion in her lumbar spine, her straight leg raise was positive, and there was decreased sensation in her right leg. (Tr. 316). Plaintiff indicated that she was afraid of needles and did not want injections. (Tr. 316). Dr. Gedeon prescribed her Vicodin. (Tr. 316).

On July 28, 2009, Plaintiff was evaluated by Dr. Neal Stansbury, M.D. at VSAS Orthopaedics. (Tr. 318). He noted that Plaintiff fell on her knee on June 5, 2009, and an MRI indicated a fracture. (Tr. 318). Her back exam revealed no tenderness, full range of motion, and negative straight leg raise. (Tr. 318). Her hip exam revealed no tenderness, full range of motion, and normal strength. (Tr. 318).

Her ankle exam revealed full range of motion and normal strength. (Tr. 319). Her knee exam revealed tenderness, but the rest of the exam was "benign," with "good range of motion." (Tr. 319). Plaintiff found a knee brace that "provided satisfactory support without significant pain," and Dr. Stansbury gave her a prescription for the brace. (Tr. 319). He noted that he "would like her to get into physical therapy to restore normal function as soon as possible so she can get back to work, etc." (Tr. 319).

On August 25, 2009, Plaintiff followed-up with Dr. Khan. (Tr. 254). She still had not started physical therapy, despite being consistently advised to do so since April of 2009. (Tr. 254). On exam, she was a "conscious, cooperative, oriented patient in no acute distress." (Tr. 254). She had "good spontaneous speech," "good immediate recall," and "good calculation." (Tr. 255). Her motor examination was normal, her sensation was intact, and her gait and station were normal. (Tr. 255). Plaintiff reported memory loss, which Dr. Kahn opined "can be due to medicines." (Tr. 255). He recommended that she taper off Gababentin and prescribed her Propranol HCl. (Tr. 255).

On October 2, 2009, Plaintiff presented to Dr. Gedeon for an epidural steroid injection. (Tr. 413). Plaintiff reported that the last procedure reduced her pain by 70%. (Tr. 413). Plaintiff reported that the "[d]uration of pain reduction after the last procedure" was "4 weeks." (Tr. 413). Her "[a]ctivity is now normal." (Tr.

413). She had decreased range of motion and joint pain, but no neurological symptoms. (Tr. 413). Her gait was normal, she had "normal cervical spine movements," she had "no tenderness to palpation, no pain," no swelling, and her sensation was "normal." (Tr. 414). She had moderate tenderness in her lumbar spine and decreased range of motion in her lumbar spine. (Tr. 414). Her straight leg raise was positive. (Tr. 414). Plaintiff received the injection and tolerated the procedure well. (Tr. 414).

On October 5, 2009, Plaintiff followed-up with Dr. Kahn. (Tr. 256). She still had not started physical therapy. (Tr. 256). She had not started Propranol and was no longer on Flexeril. (Tr. 256). Plaintiff reported that she no longer had any numbness in her hands and that her memory was better. (Tr. 256). On exam, she was a "conscious, cooperative, oriented patient in no acute distress." (Tr. 256). She had "good spontaneous speech" and "good calculation." (Tr. 256). Her motor examination was normal, her sensation was intact, and her gait and station were normal. (Tr. 256-57). He prescribed her amitriptyline. (Tr. 257).

On October 23, 2009, Plaintiff followed-up with Dr. Gedeon. (Tr. 417). Dr. Gedeon noted that after the "last ESI, the patient experienced a…reaction with her blood pressure dropping…[she] was coherent but refused to let me insert an intravenous line." (Tr. 417). "A week later, she called the office complaining of nausea, headache, and not feeling well….[Dr. Gedeon] instructed the patient to go

to the local Emergency room via an ambulance…she refused. She insisted on making her feel better while at home…I asked her for her husband's phone number at work which she refused to give to me for 10 minutes." (Tr. 417). Dr. Gedeon noted that "based on the patient's noncompliance, I decided not to perform the sacroiliac joint injection today. She apologized about her behavior. She states that she will follow my instructions from now on." (Tr. 417). Plaintiff indicated that she understood "if she violates the office policy in any form, she will be discharged from the practice. (Tr. 417). She reported a pain reduction of fifty percent for two weeks after the last injection. (Tr. 416). She reported that her pain was "aggravated by exertion," her "activity [was] now limited," and her sleep had "improved." (Tr. 416). Her condition was "stable." (Tr. 416). Plaintiff reported anxiety. (Tr. 416). On exam, her gait was normal, she had tenderness, a Pheasant test was positive, her straight leg raise was negative, her Patrick test was positive, and she had decreased range of motion. (Tr. 417).  Dr. Gedeon prescribed Plaintiff Percocet and Robaxin. (Tr. 417).

On November 6, 2009, Plaintiff presented to Dr. Gedeon for an injection. (Tr. 419). She reported that the last procedure reduced her pain by sixty percent . (Tr. 419). She reported that her pain was "moderate," that it was aggravated by "walking and lifting," her activity was "now limited," and her sleep was "limited."

(Tr. 419). On exam, she had tenderness. (Tr. 420). She received the injection, tolerated the procedure well, and there were no complications. (Tr. 420).

On January 13, 2010, Plaintiff presented to Dr. Gedeon for an injection. (Tr. 423). She reported that her lower back pain was "moderate," that it was aggravated by "any movement,"  her activity was "now limited," and her sleep was "limited." (Tr. 419). On exam, she had a positive straight leg raise and tenderness. (Tr. 423). She received the injection, tolerated the procedure well, and there were no complications. (Tr. 423).

On February 2, 2010, Plaintiff followed-up with Dr. Stansbury. (Tr. 328). Plaintiff complained of pain in her knee and sacroiliac joint, walked with her foot externally rotated, and had increasing wear on the lateral aspect of her left heel. (Tr. 328). On exam, her knee had "no effusion." (Tr. 328). Notes indicate that Plaintiff's:

> [S]ymptoms, physical examination, and radiographs all correlate with significantly symptomatic knee osteoarthritis. There have been appropriate trial of activity modification and anti-inflammatory analgesic medications. Despite these interventions, the patient continues to have significant pain and functional disability.

(Tr. 328). Dr. Stansbury concluded that Plaintiff was an appropriate candidate for injection. (Tr. 328).

On April 30, 2010, Plaintiff followed-up with Dr. Gedeon. (Tr. 425). She described her pain as "moderate to severe," a seven out of ten. (Tr. 425). Her

activity and sleep were limited. (Tr. 425). Plaintiff reported a 60% reduction in pain after the last injection that lasted three weeks. (Tr. 425). She reported that her pain was aggravated by bending, lifting, twisting, walking upstairs and prolonged standing. (Tr. 425). Plaintiff reported anxiety. (Tr. 425).   She was in acute distress, her gait was normal, her sensation was decreased, and she had tenderness in her lumbar spine. (Tr. 426). Her Pheasant test, straight leg raise, and Patrick test were positive. (Tr. 426). Plaintiff was prescribed Nucynta and was instructed to schedule an injection in two weeks. (Tr. 426).

On May 19, 2010, Plaintiff had an MRI of the lumbar spine. (Tr. 395). It indicated "[m]ild spondylitic changes. Mild loss of intervertebral disc space height at L5-S1 and to a lesser extent L4-L5. There is minimal associated central stenosis and foraminal encroachment. No findings suggestive of an acute process." (Tr 395).

On June 18, 2010, Plaintiff followed-up with Dr. Gedeon. (Tr. 427). Plaintiff reported that he pain was "severe," a "10" out of ten. (Tr. 427). Her activity and sleep were limited. (Tr. 427). Plaintiff reported that her pain was aggravated by walking and prolonged sitting. (Tr. 427). Plaintiff's pain was partially relieved by opiates but it was "unimproving." (Tr. 427). She reported anxiety. (Tr. 427). She was in acute distress. (Tr. 428). On exam, she had normal gate, decreased sensation, tenderness, positive straight leg raise, positive Pheasant test, and

positive Patrick test. (Tr. 428). She was continued on Nucynta, prescribed morphine, and scheduled for an injection. (Tr. 428).

On September 22, 2010, Plaintiff was evaluated at St. Luke's Neurological Associates by Dr. Nancy Diaz, M.D. (Tr. 273). She reported that she had "extremity pain for over 2-3 years which has worsened over the past months, forgetfulness over the past year, and migraine headaches." (Tr. 272). She reported chronic full body pain. (Tr. 272). She reported difficulty sleeping and felt fatigued. (Tr. 272). She reported that her migraines typically last one to two days and occur four times or more a month. (Tr. 272). She appeared "anxious." (Tr. 272). Her speech was "clear and appropriate." (Tr. 272). She displayed irritability periodically, her affect was "confused and labile," and she was "unable to concentrate." (Tr. 273). Her speech was rapid and her memory was grossly intact. (Tr. 273). She had normal strength and muscle tone and full range of motion. (Tr. 273). Her reflexes were normal and her sensation was intact except for decreased sensation to vibration on the toes. (Tr. 273). Her gait and station were normal. (Tr. 273). Dr. Diaz indicated that, "given progression of symptoms over the past year and worsening neck pain, we will obtain an MRI of the brain and cervical spine for comparison. (Tr. 273).

On April 21, 2011, Plaintiff completed a teleclaim with the state agency. (Tr. 203). The interviewer observed "no" problems with hearing, reading, understanding, concentrating, talking, or answering. (Tr. 203).

On May 2, 2011, Plaintiff submitted a Function Report. (Tr. 219). She indicated multiple current physical and mental limitations, but did not indicate whether these limitations had been present prior to June 30, 2010. (Tr. 213). She did indicate that her inability to cross-stitch started in approximately December of 2009. (Tr. 216).

On June 3, 2011, state agency physician Dr. Louis Tedesco, M.D., reviewed Plaintiff's file. (Tr. 141). He completed an RFC assessment for Plaintiff's date last insured of June 30, 2010. (Tr. 139). Dr. Tedesco reviewed evidence from Dr. Sharp, received May 18, 2011, evidence from Dr. Gedeon, received May 17, 2011, evidence form Gnaden Huetten Memorial Hospital, received May 10, 2011, evidence from St. Luke's, received May 5, 2011, and evidence from Dr. Khan, received May 2, 2011. (Tr. 135-36, 150). This evidence comprised Exhibits 1F to 5F of the record before the ALJ and pages 243 to 449 of the administrative transcript. (Tr. 243-449). He opined that, as of June 30, 2010, Plaintiff could lift up to twenty pounds occasionally and up to ten pounds frequently. (Tr. 139). He opined that, as of June 30, 2010, Plaintiff could stand and/or walk for about six hours out of an eight-hour day and could sit for about six hours out of an eight-

hour day. (Tr. 139). He opined that, as of June 30, 2010, Plaintiff was not limited in her ability to push or pull, did not have postural, manipulative, visual, communicative, or environmental limitations. (Tr. 139).

On June 12, 2012, Plaintiff appeared and testified at a hearing before an ALJ. (Tr. 110). She testified to a variety of current limitations and impairments that she was suffering from "right now." (Tr. 115-116). She testified that she had been getting injections for "three or four years" that provide relief for only five days. (Tr. 118). She testified that she has been getting migraines since 1977, and they vary in intensity. (Tr. 118). She testified that she had started seeing a psychiatrist for anxiety two weeks earlier. (Tr. 120). She testified that her primary doctor had been treating her for anxiety prior to that, but that she had not been receiving treatment for any other mental health treatment. (Tr. 120). She testified that she had only been suffering from concentration problems for "maybe a year or two." (Tr. 124).

A VE also appeared and testified. (Tr. 125). The VE testified that, given the RFC assessed by the ALJ described below, Plaintiff not perform her past relevant work, but she could perform other work in the national economy in positions as a cashier, a light unskilled job with Dictionary of Occupational Titles ("DOT") code 211.462-010, kitchen worker, a light unskilled job with DOT code 318.687-018, and a laundry worker, a light unskilled job with DOT code 369.687-018. (Tr. 127-

29). The vocational expert also identified jobs that would be available if Plaintiff was limited to sedentary work with a sit/stand option and the same nonexertional restrictions. (Tr. 129). The VE testified that if Plaintiff needed extra breaks or would be off task 20 percent of the work day, there would be no work she could perform. (Tr. 129). The VE testified that these jobs were "not tandem productivity jobs, they're more independent…your work pace has to be maintained based on the employer work standards, but it's not one of those jobs where the individual is working on the line and affecting the person directly next to them." (Tr. 130).

On July 24, 2012, the ALJ issued the decision. (Tr. 71).  At step one, the ALJ found that Plaintiff was insured through June 30, 2010, and did not engage in substantial gainful activity in the period since August 1, 2009. (Tr. 62). At step two, the ALJ found that Plaintiff's headaches, white matter brain abnormalities, right hip bursitis and lumbar disc disease ("DDD"), cervical DDD, and depression were medically determinable and severe through the date last insured. (Tr. 62). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 63). The ALJ found that Plaintiff had the RFC to perform light work with occasional climbing of ramps and stairs but never ladders, ropes or scaffolds, occasional stooping, crouching, kneeling and crawling, and avoid jobs with concentrated exposure to fumes, odors, dusts, gases, poor ventilation, vibrations and hazards such as heights and moving machinery, and a further limitation to jobs requiring

only the ability to understand, remember and carry out simple instructions. (Tr. 65). The ALJ found that Plaintiff could not perform her past relevant work but, in accordance with the VE testimony, could perform other work in the national economy. (Tr. 70-71). As a result, the ALJ found that Plaintiff was not disabled prior to June 30, 2010 and not entitled to disability benefits. (Tr. 71).

## VI.     Plaintiff Allegations of Error

### A. The ALJ's RFC assessment

Plaintiff asserts that the ALJ erred in failing to include all of her credible limitations in the RFC assessment. Specifically, Plaintiff asserts that the ALJ failed to credit:

- Plaintiff's testimony of debilitating pain that would preclude her from performing light work, as the ALJ found she could do. (Pl. Brief at 6).
- Dr. Gedeon's notation that Plaintiff had "poor quality of life due to pain in her neck and low back pain." (Pl. Brief at 6).
- Plaintiff report on October 23, 2009 that her "pain was aggravated by exertion and that her activities were limited." (Pl. Brief at 6).
- Plaintiff's report that her "pain was aggravated by bending, lifting, twisting, walking upstairs and prolonged standing." (Pl. Brief at 6).
- Dr. Gedeon's June 18, 2010 notation that Plaintiff was experiencing pain at a level of 10 on a pain scale of 0-10, that it was aggravated by walking and prolonged sitting, that her activities were limited, her sleep was limited and her "condition is unimproving." (Pl. Brief at 7).
- Plaintiff's report of migraine headaches three to four times per month that would last one to two days (Pl. Brief at 8).

However, most of these are generic claims that Plaintiff was in pain. The only specific limitations Plaintiff identifies are bending, lifting, twisting, walking up stairs, walking, prolonged sitting, and migraine headaches.

The ALJ's hypothetical accounted for Plaintiff's limitation in walking up stairs by restricting her to jobs that required only occasional climbing of stairs. (Tr. 65). Moreover, the jobs identified by the VE do not require climbing stairs. The DOT description for a cashier states:

> Climbing: Not Present - Activity or condition does not exist
> Balancing: Not Present - Activity or condition does not exist
> Stooping: Not Present - Activity or condition does not exist
> Kneeling: Not Present - Activity or condition does not exist
> Crouching: Not Present - Activity or condition does not exist
> Crawling: Not Present - Activity or condition does not exis

211.462-010 CASHIER II, DICOT 211.462-010. The DOT description for a kitchen worker states:

> Climbing: Not Present - Activity or condition does not exist
> Balancing: Not Present - Activity or condition does not exist
> Stooping: Not Present - Activity or condition does not exist
> Kneeling: Not Present - Activity or condition does not exist
> Crouching: Not Present - Activity or condition does not exist
> Crawling: Not Present - Activity or condition does not exist

318.687-018 SILVER WRAPPER, DICOT 318.687-018. The DOT description for a laundry worker states:

> Climbing: Not Present - Activity or condition does not exist
> Balancing: Not Present - Activity or condition does not exist
> Stooping: Not Present - Activity or condition does not exist
> Kneeling: Not Present - Activity or condition does not exist

Crouching: Not Present - Activity or condition does not exist
Crawling: Not Present - Activity or condition does not exist

369.687-018 FOLDER, DICOT 369.687-018. These descriptions also establish that they do not require bending or twisting. *Id.*; *see also* SSR 85-15 ("Stooping, kneeling, crouching, and crawling are progressively more strenuous forms of bending parts of the body, with crawling as a form of locomotion involving bending."). Consequently, any failure in assessing these limitations was harmless. "A number of other courts have found harmless error where an alleged limitation that was not included in the ALJ's hypothetical (or in the RFC) was not necessary to perform one or more of the jobs identified by the VE, according to the DOT." *Rochek v. Colvin*, 2:12–CV–01307, 2013 WL 4648340 at *12 (W.D.Pa. Aug.23, 2013); *Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir. 2005) (remand is not required when it would not affect the outcome of the case).

Thus, the only limitations that could have affected the outcome if the ALJ erred in failing to include them are the limitations in prolonged standing, prolonged walking, and three to eight days of headaches per month that are relieved only by sleeping. Plaintiff cites to Tr. 245-47, 250, 252-254, 256, 272, 316, 328, 395, 413, 416, 419, 423, 425, 427, 563 as medical evidence to support these limitations.

However, these medical records show only diagnoses, symptoms, and Plaintiff's subjective report of limitations. The ALJ found that Plaintiff's subjective claims were not credible, and Plaintiff has not adequately challenged

this finding. Plaintiff cursorily alleges that the ALJ failed to explain why he "reject[ed]…Plaintiff's testimony of ongoing pain," (Pl. Brief at 8), but does not develop this argument further. Failure to adequately raise an issue results in its waiver. *See Kiewit Eastern Co., Inc. v. L & R Construction Co., Inc.,* 44 F.3d 1194, 1203–04 (3d Cir.1995) (upholding a district court's finding that a party had waived an issue when a party only made vague references to the issue); *Crawford v. Washington*, 541 U.S. 36, 68 (2004) (declining to "mine the record" in order to support party's case).

Regardless, the ALJ provided sufficient explanation. The ALJ found that Plaintiff's claims were not fully credible because objective evidence failed to substantiate her claims, she was noncompliant with physical therapy and medication, her treatment was routine and conservative, and she made inconsistent allegations regarding her activities and symptoms. (Tr. 66-69). This is an accurate characterization of the record. For instance, at the hearing, Plaintiff testified that her injections only gave her relief for a maximum of five days. (Tr. 118). However, she reported a fifty percent reduction for two weeks, a sixty percent reduction for three weeks, and a seventy percent reduction for four weeks. (Tr. 413, 419, 423, 425). Thus, the medical records cited by Plaintiff do not support her functional limitations because, to the extent they address functional limitations, they are based on subjective claims that are not credible.

Moreover, the ALJ relied on Dr. Tedesco's opinion. Dr. Tedesco reviewed evidence from Dr. Sharp, received May 18, 2011, evidence from Dr. Gedeon, received May 17, 2011, evidence form Gnaden Huetten Memorial Hospital, received May 10, 2011, evidence from St. Lukes, received May 5, 2011, and evidence from Dr. Khan, received May 2, 2011. (Tr. 135-36, 150). This evidence comprised Exhibits 1F to 5F of the record before the ALJ and pages 243 to 449 of the administrative transcript. (Tr. 243-449). Thus, all of the medical evidence cited by Plaintiff except the March 2009 MRI[1] of the cervical spine was reviewed and evaluated by Dr. Tedesco. (Tr. 563). After reviewing these records, Dr. Tedesco opined that Plaintiff could stand, walk, or sit for six hours out of an eight-hour work day and could perform light work. (Tr. 134-41).

The records cited by Plaintiff are not inconsistent with Dr. Tedesco's opinion. They show that she consistently reported to Dr. Gedeon that her pain was only moderate prior to her date last insured, that it was moderate to severe a month after her date last insured, and severe several months after her date last insured. (Tr. 413, 416, 419, 425, 427). They show that, prior to her date last insured, she reported between fifty and seventy percent reduction in pain for two to four weeks after each injection. *Id.* They show that she was almost discharged from Dr. Gedeon's care for noncompliance. *Id*. The records cited by Plaintiff also show that

---

[1] This MRI indicated only "mild abnormalities." (Tr. 563).

Dr. Kahn's physical and mental status examinations were entirely normal on April 23, 2009, May 27, 2009, July 13, 2009, and August 25, 2009. (Tr. 245-55). Dr. Khan consistently noted Plaintiff's noncompliance with physical therapy and obtaining prescription medications. *Id.* Imaging studies revealed only "mild" or "minimal" abnormalities. (Tr. 395, 563).

Plaintiff has reviewed these medical records, and urges the Court to interpret them to conclude that she could not engage in prolonged sitting or standing and would be absent due to migraines several times per month. However, the ALJ was entitled to rely on Dr. Tedesco, who has medical training, to conclude that Plaintiff could still perform a light work as of her date last insured. (Tr. 134-41). A reasonable mind could accept this opinion as adequate, and substantial evidence supports the ALJ's RFC assessment as of June 30, 2010.

## B. The ALJ's determination of onset date

Plaintiff must establish disability prior to the date last insured to qualify for DIB. As the Third Circuit has explained:

> [U]nder 42 U.S.C. § 423(a)(1)(A) and (c)(1), an individual is only eligible to receive disability insurance benefits if she was insured under the Act at the time of the onset of her disability. See also 20 C.F.R. §§ 404.130, 404.315(a); Kane v. Heckler, 776 F.2d 1130, 1131 n. 1 (3d Cir.1985). Here, the onset date of Appellant's disability is critical because it is determinative of whether she is entitled to benefits at all. See SSR 83–20, 1983 WL 31249, at *1 (1983). The ALJ determined, and the parties do not dispute, that based on Appellant's work history, the date when she was last insured was June

30, 1988. Therefore, to be entitled to disability benefits, Appellant was required to show that became disabled before this date.

*Perez v. Comm'r of Soc. Sec.,* 521 Fed.Appx. 51, 54 (3d Cir. 2013); *see also*

*Winger v. Barnhart*, 320 F.Supp.2d 741, 743 (C.D. Ill. 2004) (Claimant who

"worked only intermittently outside the home" and worked primarily as a

"homemaker" was not entitled to DIB benefits, and this denial did not violate

constitutional protections because "the quarters of coverage system: (1) makes the

Social Security program self-supporting, and (2) creates a method of limiting

Social Security benefits for those who have been dependent on their earnings.").

Medical evidence must support a finding of disability onset. Social Security

Ruling[2] ("SSR") 83-20 explains:

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

SSR 83-20.

---

[2] "Social Security Rulings…are binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1).

Here, the ALJ complied with SSR 83-20 by relying on the opinion of Dr. Tedesco. Dr. Tedesco opined that, as of the date last insured, Plaintiff could perform a range of light work. (Tr. 134-41).

Even if the ALJ had not relied on Dr. Tedesco, by the plain language of SSR 83-20, a medical expert only needs to be called when the onset is alleged to be "prior to the date of the first recorded medical examination." *Id.*; *see also Perez v. Comm'r of Soc. Sec.*, 521 Fed.Appx. 51, 56-57 (3d Cir. 2013) (Upholding ALJ's determination of onset, despite failing to elicit medical expert testimony, because the ALJ had medical records that "predated Appellant's claimed date of onset of disability," explaining "[w]e have generally…required the ALJ to call a medical expert where medical evidence from the relevant period is unavailable"); *Jakubowski v. Comm'r of Soc. Sec.*, 215 Fed.Appx. 104, 108 (3d Cir. 2007) (Upholding the ALJ's determination of onset, despite failing to elicit medical expert testimony, because "the ALJ…had access to adequate medical records from the time period before the expiration of [claimant's] insured status, and these records did not support her alleged onset date.").

Here, the ALJ had access to medical records from the time period before the expiration of Plaintiff's expired status. Plaintiff asserts that the ALJ still needed to call a medical expert because the medical records show evidence of deterioration from March of 2009 to October of 2010. (Pl. Brief at 10-11) (citing Tr. 277-78,

563). Again, however, Dr. Tedesco reviewed the records from October of 2010, and determined that Plaintiff was not disabled as of June 30, 2010. (Tr. 134-41). Plaintiff also asserts that her testimony regarding her function prior to her date last insured should have been credited. (Pl. Brief at 11) (citing *Walton v. Halter*, 243 F.3d 703, 709 (3d Cir. 2001)). However, in *Walton*, there were no medical records from prior to the alleged onset date. *Id*. Thus, Plaintiff has not identified any basis to conclude that the ALJ failed to comply with SSR 83-20 by relying on Dr. Tedesco's opinion.

## C. The ALJ's VE hypothetical

Plaintiff asserts that the ALJ's failure to include specific limitations in the RFC assessment regarding her concentration, persistence, and pace violate Third Circuit precedent. In *Burns v. Barnhart*, 312 F.3d 113 (3d Cir. 2002), the ALJ had found that the claimant had borderline intellectual functioning, and accommodated for this limitation by restricting the claimant to simple, repetitive, one and two-step tasks. The Third Circuit found that the ALJ's step five determination, based on a VE hypothetical, lacked substantial evidence:

> Here, the ALJ's hypothetical did not refer to any of the type of limitations later outlined in Dr. Laviolette's report. Instead, it merely referred to "simple repetitive one, two-step tasks." This phrase, however, does not specifically convey Burns' intellectual limitations referenced in Dr. Laviolette's report. Rather, it could refer to a host of physical and mental limitations, such as a person's mechanical or small motor skills, his lack of initiative or creativity, or a fear of, or unwillingness to take on, unfamiliar tasks. While the phrase could

> encompass a lack of intelligence, it does not necessarily incorporate all of the borderline aspects of Burns' intellectual functioning or the other deficiencies identified in Dr. Laviolette's report. For example, it certainly does not incorporate Dr. Laviolette's finding that Burns is borderline in the areas of reliability, common sense, ability to function independently, and judgment, or that he manifests flightiness, disassociation, oppositional tendencies, and difficulties in comprehension. As a result, the hypothetical did not include all of the limitations suffered by Burns, thus making it deficient.

*Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002). More importantly, the Third Circuit has specifically addressed the need to include limitations in concentration, persistence, and pace in an RFC assessment or VE hypothetical. In *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004), the Court held that a limitation to simple one or two step tasks was not sufficiently sufficient to convey limitations in concentration, persistence, and pace identified on a Psychiatric Review Technique Form ("PRTF"). *Id*. at 552.

However, in *Ramirez*, the vocational expert testified "that each of the jobs suitable for Ramirez (assembler, packer, and inspector) would have daily production quotas and that Ramirez would have to maintain a certain degree of pace to maintain those jobs." *Id*. The Court also explained that:

> Of course, there may be a valid explanation for this omission from the ALJ's hypothetical. For example, the ALJ may have concluded that the deficiency in pace was so minimal or negligible that, even though Ramirez "often" suffered from this deficiency, it would not limit her ability to perform simple tasks under a production quota. The record, however, would seem to suggest otherwise.

*Id*. The Court explained that a medical expert had specifically testified that the claimant's ability to finish tasks was dependent on her proximity to her children. *Id*. Thus, in *Ramirez*, the record "suggest[ed]" that an additional limitation related to pace was necessary. *Id*. As another Court in this District has explained:

> Moreover, we find the Third Circuit's decision in *Ramirez* distinguishable from the instant case. In *Ramirez,* the court observed that there may have been a valid explanation for the omission of a more detailed description of the claimant's mental limitation from the ALJ's hypothetical. *Ramirez,* 372 F.3d at 555. The court noted that "the ALJ may have concluded that the deficiency in pace was so minimal or negligible that, even though Ramirez 'often' suffered from this deficiency, it would not limit her ability to perform simple tasks under a production quota," but found that the record seemed to suggest otherwise. *Id.* The instant case presents the opposite situation, the record suggests that even though Plaintiff suffers from a moderate deficiency in the areas of concentration, persistence, and pace, and a mild deficiency in the area of social functioning, these limitations did not effect her ability to function in any discernable fashion during the relevant period.

*Whitmire v. Comm'r of Soc. Sec.*, 3:13-CV-1380, 2014 WL 582781, at *8-9 (M.D. Pa. Feb. 14, 2014) (Kane, J.); *see also Santiago-Rivera v. Barnhart*, CIV.A. 05-5698, 2006 WL 2794189, at *11 (E.D. Pa. Sept. 26, 2006) ("It is true that, in Ramirez, the Third Circuit held that greater specificity than a limitation to one to two step simple tasks *may* be necessary in presenting functional limitations caused by a mental impairment in a hypothetical to a VE. However, the *Ramirez* Court specifically suggested that the case in which more may be required is one in which the Santiago-Rivera had *clearly established in the record* additional, specific

deficiencies in concentration, persistence and/or pace that could not be adequately conveyed by a hypothetical limited to simple tasks.")(emphasis in original).

Here, in assessing Plaintiff's concentration, persistence, and pace, the ALJ wrote:

> The claimant testified because of her migraine headaches she could not focus and has trouble concentrating ,but has only been suffering from a lack of concentration for maybe a 'year or two' (Hearing Testimony). The claimant in her function report remarked she can pay attention "about 30 minutes" and does not finish what she starts. She also noted she could follow written instruction 'so-so' and oral instructions 'fine,' but does not handle stress or changes in routine. However, the claimant indicated she could pay bills, count change and handle savings and checking accounts. (Exhibit 5E). *Giving the claimant every benefit of the doubt,* the totality of the evidence demonstrates that claimant has no more than "moderate" difficulties with regard to concentration, persistence and pace.

(R. 64).

Plaintiff asserts that, because the ALJ cited Plaintiff's report of being unable to "finish what she starts," the ALJ made a finding that Plaintiff had a deficiency in pace. (Pl. Brief at 14). However, it appears that the ALJ was merely reciting Plaintiff's claims, which, as discussed above, he did not find credible. The ALJ specifically noted that, for this portion of the opinion, he was "[g]iving [Plaintiff] every benefit of the doubt." (Tr. 64). Beyond Plaintiff's claims, the record does not otherwise indicate problems with pace.  Unlike *Ramirez*, there is no medical expert testimony that Plaintiff's ability to handle pace is impaired. As the ALJ accurately noted, "[t]he RFC even limits her to simple unskilled work to account for the

mental impairment that was virtually without any adverse objective findings as of June 30, 2010. (Tr. 69). This is consistent with Plaintiff's testimony, as she indicated that she had only been suffering from concentration problems for "maybe a year or two" as of June 2012. (Tr. 124).

Moreover, in *Ramirez,* the vocational expert testified "that each of the jobs suitable for Ramirez (assembler, packer, and inspector) would have daily production quotas and that Ramirez would have to maintain a certain degree of pace to maintain those jobs." *Id*. at 552.  Here, the VE testified that these jobs were "not tandem productivity jobs, they're more independent…your work pace has to be maintained based on the employer work standards, but it's not one of those jobs where the individual is working on the line and affecting the person directly right next to them." (Tr. 130). Thus, Plaintiff has not identified any credible evidence that she had additional mental limitations beyond those assessed by the ALJ as of June 30, 2010.

### D. Sentence Six

Plaintiff asserts that remand is appropriate because she submitted "new and material" evidence after the ALJ decision, specifically an evaluation by Plaintiff's primary care provider. However, when the Appeals Council denies review, evidence that was not before the ALJ may only be used to determine whether it provides a basis for remand under sentence six of section 405(g), 42 U.S.C.

("Sentence Six"). *Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831,

833 (3d Cir. 1984). Sentence Six requires a remand when evidence is "new" and

"material," but only if the claimant demonstrated "good cause" for not having

incorporated the evidence into the administrative record. *Id.* With regard to the

good cause requirement, the Third Circuit in *Matthews v. Apfel*, 239 F.3d 589 (3d

Cir. 2001) explained:

> We should encourage disability claimants to present to the ALJ all
> relevant evidence concerning the claimant's impairments. If we were
> to order remand for each item of new and material evidence, we
> would open the door for claimants to withhold evidence from the ALJ
> in order to preserve a reason for remand. *See Szubak*, 745 F.2d at 834
> ("A claimant might be tempted to withhold medical reports, or refrain
> from introducing all relevant evidence, with the idea of obtaining
> another bite of the apple if the Secretary decides that the claimant is
> not disabled.") (quotation omitted); *Wilkins,* 953 F.2d at 97
> (Chapman, J., dissenting) ("By allowing the proceedings to be
> reopened and remanded for additional evidence, ... the majority is
> encouraging attorneys to hold back evidence and then seek remand for
> consideration of evidence that was available at the time of the ALJ
> hearing."). Instead, we believe that it is a much sounder policy to
> require claimants to present all material evidence to the ALJ and
> prohibit judicial review of new evidence unless there is good reason
> for not having brought it before the ALJ. Such a holding is
> instrumental to the speedy and orderly disposition of Social Security
> claims.

*Id.* at 595.

Plaintiff asserts that she had "good cause for failing to submit the evidence

earlier, in that Plaintiff would not have been aware of the importance of obtaining a

specific opinion from her treating source about her condition prior to the DLI until

she read the ALJ's decision." (Pl. Brief in 16). The Court in *Matthews* rejected a

similar argument:

> Matthews argues that she did not realize the importance of obtaining a
> vocational evaluation of her arithmetic skills early in the proceedings.
> But Matthews should have known that her ability to work was an
> issue at the ALJ hearing that was held after remand by the Appeals
> Council. Indeed, a vocational expert had testified on July 11, 1996 (at
> the second ALJ hearing) that Matthews could perform cashier and
> similar types of jobs. Tr. at 169–79. By then, it should have been clear
> to Matthews that her arithmetic and reading skills were relevant.

*Matthews v. Apfel*, 239 F.3d 589, 595 (3d Cir. 2001).

Here, Plaintiff was eligible only for DIB. Establishing disability prior to the

onset date is critical to a DIB claim. SSR 83-20. When Plaintiff's application for

DIB was initially denied by the state agency on June 7, 2011, the notice

specifically stated "[w]e have determined your condition was not disabling on any

date through June 30, 2010, when you were last insured for disability benefits."

(Tr. 143). The notice continued, "[t]he medical evidence in file does not show an

impairment of disabling severity which was present prior to the date you were last

insured for disability benefits." (Tr. 143). Plaintiff requested a hearing before an

ALJ, and subsequently received a notice of hearing. (Tr. 88). That notice stated

"[o]ur records indicate that your date last insured is June 30, 2010. If this is

correct, [t]he ALJ must decide whether you became on or before that date." (Tr.

88). At the hearing before the ALJ, the ALJ stated that Plaintiff's date last insured

was "June 30, 2010." (Tr. 114). Consequently, Plaintiff was on notice that she was required to provide medical evidence of her disability prior to her onset date early in the administrative process. It should have been clear to Plaintiff that this opinion would have been important prior to the ALJ's decision. Plaintiff has not established good cause for failing to submit this evaluation, or other evidence from prior to her date last insured, to the ALJ. Requiring a remand in this case would "would open the door for claimants to withhold evidence from the ALJ in order to preserve a reason for remand." *Matthews*, 239 F.3d at 595. The Court did not consider this evidence and does not recommend remand pursuant to Sentence Six.

## VII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to

support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: February 13, 2015                  _____ s/Gerald B. Cohn _____

GERALD B. COHN
UNITED STATES MAGISTRATE JUDGE